THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES A. McKINESS, Defendant-Appellant.

Second District   No. 80-814

Opinion filed March 25, 1982.

Mary Robinson and Josette Skelnik, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

The defendant, James A. McKiness, was convicted by a jury of theft over $150 (Ill. Rev. Stat. 1979, ch. 38, par. 16—1), and subsequently was sentenced to 36 months' probation with a condition thereof that the first 30 days were to be served in the Kane County Correctional Center.

The defendant appeals and presents three issues for review: (1) whether he was denied due process of law in that his sixth and fourteenth amendment (U.S. Const., amends. VI, XIV) rights had been infringed by prosecutorial threats to a potential defense witness thereby causing the witness to refuse to testify; (2) whether he was properly convicted of

felony theft where the jury was not given an instruction requiring them to determine if the value of the stolen property, a post-hole digger, was in excess of $150; and (3) that the trial court improperly sentenced him to 36 months' probation for a Class 3 felony. See Ill. Rev. Stat. 1979, ch. 38, par. 1005—6—2(b)(2).

The facts pertinent to this appeal are summarized as follows. At trial the State's first witness was Lee Patterson, proprietor of Tri-City Rentals in St. Charles, Illinois. He testified that his business involves renting tools to construction firms and private individuals. On November 30, 1979, at approximately 5 p.m., two men entered his store and inquired about renting a post-hole digger. One of the men was the defendant, James McKiness.

Mr. Patterson explained to the two men how to operate the different post-hole diggers he had for rental. Defendant picked out a two-man post-hole digger because he had operated one before. He asked in whose name the machine would be rented, and the man who was with defendant indicated that the rental contract should be put in his name, which he said was Phil Williams. In defendant's presence, Mr. Patterson referred to this individual as Phil.

While Mr. Patterson was completing the contract, defendant walked away from the counter and stood by the front door. Mr. Patterson asked the other man for a $40 deposit and some identification, and received from the individual $40 in cash and a traffic ticket bearing the name Phil Williams.

After the contract was completed, Mr. Patterson came out from behind the counter and explained how to operate the machine. The defendant said that he knew how to operate the machine because he had used that type of equipment before. While the men carried the post-hole digger out of the store, Mr. Patterson went to get the auger (drill bit) for the digger. He yelled out "Phil" to the individual who identified himself as such because he did not want the man to forget the auger, and he handed the auger to defendant as the two men were leaving. He closed his store shortly after the men left.

Because the rental period of the contract was for one day, Mr. Patterson became suspicious when the equipment was not returned the next day. The following Monday, Mr. Patterson called the police.

During direct examination, the assistant State's Attorney questioned Mr. Patterson regarding his opinion as to the fair market value of the post-hole digger. Mr. Patterson testified that his current business includes buying and selling equipment such as the type he rents in his present business, including post-hole diggers. He further testified that, by checking with manufacturers and looking at brochures which listed prices, he

formed the opinion that the fair market value of the post-hole digger was $500.

Detective Dan Klinkhamer testified that on December 13, 1979, at approximately 4:40 p.m., he telephoned defendant and advised him that he wished to speak to him in connection with an alleged theft from Tri-City Rentals. The defendant voluntarily came to the police department for the interview and, after being advised of his rights, gave an oral and a written statement.

In his oral statement, defendant stated that his brother Tim came to his house and asked him to go to Tri-City Rentals with him to rent a post-hole digger. Defendant told Tim he would go with him after he ran a few errands downtown. Tim informed defendant that he was going to Alabama and had to get the post-hole digger before he left. After defendant ran his errands, the two men went to Tri-City Rentals. Defendant told the police that when he heard the proprietor call his brother Phil, he knew that "we were stealing the post-hole digger."

Detective John Bogolin, who was also present during the questioning of the defendant, substantially corroborated Detective Klinkhamer's testimony regarding the contents of the defendant's oral statement. However, Detective Bogolin noted that, in his written statement, defendant stated that when he heard the proprietor call his brother Phil, "right then I knew that he stole the post-hole digger."

The defense consisted of the defendant's testimony. He testified that on November 30, 1979, at around noon, his brother Tim came to his house. After the two men looked at some repairs defendant had done in the kitchen, defendant asked Tim for a ride into town to run some errands. Defendant, his wife and Tim left for town about 45 minutes later in Tim's company truck. Tim subsequently drove to Tri-City Rentals, arriving between 1:30 and 2 p.m. Defendant and Tim went into the store and walked up to the counter. While the proprietor explained the rental terms to Tim, defendant walked around the store. He looked at the various equipment and did not pay close attention to the conversation at the counter, although he did see Tim take out what looked like a traffic ticket and hand it to the proprietor. After his brother and the proprietor completed the paperwork, the proprietor showed defendant and his brother how to run the machine. After the proprietor showed them how to operate the machine, defendant helped his brother load the machine in the pickup truck which was parked just outside the door. Defendant testified that the first time he heard the proprietor call his brother "Phil" was when he and Tim were getting into the truck to leave. After leaving the store, Tim dropped defendant and his wife off at their house and left with the post-hole digger.

Defendant acknowledged that Tim had mentioned going to Alabama prior to going to Tri-City Rentals. However, he did not know that Tim was going to take the post-hole digger with him. Defendant stated that he had no intent to steal the post-hole digger.

At the conference on jury instructions, the court indicated it would give the State's tendered instruction on the issues. No objection was made by the defendant. This instruction failed to include that the State must prove that post-hole digger which the defendant controlled without authorization had a value in excess of $150. No issues instruction was tendered by the defendant. Following closing arguments and instructions to the jury, the jury found defendant guilty of theft over $150.

On August 7, 1980, a hearing began on the defendant's post-trial motion. Along with other contentions, defense counsel also raised an issue concerning Tim McKiness. Counsel noted that Tim had given a statement to the St. Charles police indicating that defendant had nothing to do with the theft. Counsel further stated that on the day of defendant's trial, Tim McKiness was at the courthouse for his own pretrial conference on theft charges arising out of the same incident. At that time, assistant State's Attorney James Doyle told Tim McKiness that if Tim testified at his brother's trial both he and his brother would go to jail but that if he did not testify both men would stay out of jail.

State's Attorney Doyle asked for time to investigate defense counsel's allegations which the court allowed. A subsequent evidentiary hearing was held on the allegations on September 26, 1980. The following testimony was adduced.

Tim McKiness testified that on the day of his brother James' trial he came to court for his own pretrial conference and to testify on his brother's behalf. After Tim talked with Walter Donat, the attorney representing him, he did not testify for his brother.

Attorney Walter Donat then testified that on June 5, 1980, he was present in court for Tim McKiness' pretrial conference, which was also being handled by assistant State's Attorney James Doyle. At approximately 9:30 or 10 a.m., Donat had a conversation with Doyle regarding Tim and defendant. Doyle asked Donat if Tim McKiness was going to testify at defendant's trial. Donat said that, to his knowledge, Tim did intend to testify. Doyle then promised that if Tim did so, he would go to jail.

Donat told defendant and Thomas McCulloch, counsel for defendant, of his conversation with Doyle. At McCulloch's suggestion, Donat returned to Doyle to clarify what the assistant State's Attorney said and what he meant because McCulloch wished to subpoena him to testify. Donat went back to Doyle and asked him what would happen if Tim testified for the defendant. Donat testified that Doyle replied:

"* * * that he would guarantee him that he would go to jail. And I

asked him what he meant. He said that my client was up on at least five or six charges. Two of them were traffic charges, but even if he went—if he would go to trial on all five or six charges and even if he was convicted on only one and even if that one was a traffic charge in front of Judge McCarthy, with my client's record that would mean that he would go to jail.

I asked what would happen if he did not testify. And Mr. Doyle said that we were back to the status quo negotiation that was up at that time."

Donat conveyed each of these conversations to Tim McKiness and left the decision whether to testify up to Tim. He advised Tim that it would be prudent not to run the risk if he did not have to and asked McCulloch how badly he needed Tim's testimony. When McCulloch stated that he thought the State had a weak case and he didn't think he needed Tim, Donat told Tim that under the circumstances he should probably play it safe. He also told Tim it was his opinion that if he testified in his brother's behalf, the State would prosecute on all pending charges and sentence him to jail if convicted. No other evidence was presented by the defendant. The State did not introduce any evidence on this issue at the hearing.

After arguments of counsel, the court denied the motion for a new trial stating in part:

"I can't say that it was, in fact, an act by the State that was improper. Viewed another way, it could be indicated as possibly improper. I don't view it as improper, based on the testimony that was adduced here."

The court then proceeded to a sentencing hearing, at which defense counsel noted that the defendant had been found accountable for a crime of which the alleged principal, Tim McKiness, ultimately had been acquitted. The court indicated that it was aware of Tim McKiness' acquittal, and sentenced defendant to 36 months' probation with the first 30 days to be spent in Kane County Correction Center.

The defendant first contends on appeal that the alleged threats to his brother, Tim, which caused him not to testify, deprived defendant of his right to a fair trial, as guaranteed by the sixth amendment (U.S. Const., amend. VI), thereby violating his due process rights guaranteed through the fourteenth amendment. (U.S. Const., amend. XIV.) The defendant argues that he was deprived of this right by the statements of assistant State's Attorney Doyle that he would guarantee that Tim would go to jail if he testified on his brother's behalf. The State argues principally that at the time of the conversations between Doyle and Donat there were ongoing plea negotiations regarding Tim McKiness and that the prosecutor's comments were not threats to influence the witness' decision to

testify but warnings that the State's position on plea bargaining could change if additional evidence became available. The State also contends that it is obvious that a prosecutor cannot "guarantee" the witness would go to jail, that there is no showing that the witness was a crucial witness, and that the defendant, subsequent to the comments of the prosecutor, took no steps to subpoena the witness or raise the question before the court during the trial.

■■ The right of a defendant to present witnesses in his own behalf in order to establish a defense is a fundamental element of due process of law. (*Washington v. Texas* (1967), 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 1022, 87 S. Ct. 1920, 1923.) In this regard the Supreme Court, in a later case more factually relevant to the case at bar, has had occasion to address this issue. In *Webb v. Texas* (1972), 409 U.S. 95, 34 L. Ed. 2d 330, 93 S. Ct. 351, the trial judge singled out the sole defense witness for a lecture on perjury. The Supreme Court noted that the judge had not stopped at a warning against perjury but that his remarks implied that he expected the witness to lie. "[I]n light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." (409 U.S. 95, 98, 34 L. Ed. 2d 330, 333, 93 S. Ct. 351, 353.) The court concluded that, under the circumstances, the judge's comments drove the witness off the stand and thus deprived the defendant of due process of law under the fourteenth amendment. 409 U.S. 95, 98, 34 L. Ed. 2d 330, 333, 93 S. Ct. 351, 353-54.

Illinois courts also have held that a defendant may be denied due process of law if he is denied the right to summon witnesses in his behalf (*People v. Avery* (1978), 61 Ill. App. 3d 327, 377 N.E.2d 1271), where prosecuting authorities cause a witness to leave the jurisdiction (*People v. Williams* (1968), 40 Ill. 2d 367, 240 N.E.2d 580), or where law enforcement officials induce a defendant to refrain from putting on witnesses by promises that "everything would be fine." (*People v. Graham* (1977), 48 Ill. App. 3d 689, 363 N.E.2d 124.) It also has been held that it is not improper for a prosecuting attorney to advise prospective witnesses of the penalties for perjury even though its effect may dissuade a witness from testifying. (*People v. Eubank* (1970), 46 Ill. 2d 383, 263 N.E.2d 869, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1657, *rehearing denied* (1971), 403 U.S. 940, 29 L. Ed. 2d 720, 91 S. Ct. 2246.) However, there appears to be no Illinois case which has addressed the precise problem presented to us in a similar factual context.

Other State jurisdictions and Federal courts also have held that it is fundamental to due process of law that a defendant be allowed to present all witnesses and evidence in his defense. In *People v. Shapiro* (1980), 50

N.Y.2d 747, 409 N.E.2d 897, the prosecutor issued repeated and unequivocal warnings to three defense witnesses the sense of which was that they would be prosecuted for perjury if their testimony was favorable to the defendant. All three decided to invoke their privilege against self-incrimination and did not testify. The court held that warnings by the prosecutor against perjury "must not be emphasized to the point where they are transformed instead into instruments of intimidation." (50 N.Y.2d 747, 762, 409 N.E.2d 897, 905.) Similarly, in *State v. Brown* (Mo. App. 1976), 543 S.W.2d 56, a warning which was given a defense witness by the prosecutor and which carried the implication that the State had enough evidence to prosecute the witness but would do so only if he testified coerced the witness not to testify thereby depriving defendant from presenting a witness crucial to his defense in violation of his right of due process. See also *Campbell v. State* (1977), 37 Md. App. 89, 376 A.2d 866.

Numerous Federal cases also have held that various types of governmental interference with a prospective witness can deprive a defendant of his constitutional right to secure and present his own witnesses to establish a defense. *E.g., United States v. Goodwin* (5th Cir. 1980), 625 F.2d 693 (defense witnesses intimidated by prosecutor and prison officials); *United States v. Hammond* (5th Cir. 1979), 598 F.2d 1008 (defense witness threatened with retaliation in other pending cases against him by FBI agent); *United States v. Henricksen* (5th Cir. 1977), 564 F.2d 197 (defense witness intimidated by terms of his plea bargain in another case); *United States v. Morrison* (3d Cir. 1976), 535 F.2d 223 (defense witness repeatedly warned by prosecutor of threatened prosecution if she testified); and *United States v. Thomas* (6th Cir. 1973), 488 F.2d 334 (defense witness told by secret service agent during recess of trial that he would be prosecuted for a felony if he testified).

■■ The State seeks to distinguish the instant case by the fact that the prosecutor was already involved in plea bargaining with Tim McKiness and therefore there was no threat to initiate or reopen prosecution. However, the unrebutted testimony of attorney Donat was that the prosecutor unequivocally stated that if Tim McKiness testified he (Doyle) would guarantee McKiness would go to jail and Doyle would go to trial on all charges pending against McKiness. Doyle also implied that plea negotiations would end if McKiness testified. Certainly, ongoing plea negotiations may be affected or altered by a subsequent change in circumstances which may later arise. Nevertheless, under the particular circumstances present in the record before us, which stands uncontradicted, we find that the prosecutor's comments were improper and calculated to intimidate the witness and to prevent him from testifying. They went beyond the legitimate bounds of advising the prospective witness of the penalties for perjury or the voicing of disbelief of a prospective witness'

contemplated testimony. While we do not attempt to delineate herein the parameters of a prosecutor's comments when confronted with a similar factual situation, we do hold that the statements made under the circumstances before us are clearly improper.

Finding these comments improper, however, does not resolve the entire issue before us under the rather unusual facts of this case. Subsequent to the prosecutor's comments, attorney Donat informed defendant's attorney of the comments, and they discussed the risk McKiness was running if he testified and the strength of the case against the defendant. Defendant's attorney informed Donat that the State had a very weak case against the defendant and he didn't think they needed McKiness. No subpoena was issued for McKiness' testimony, no further effort was made by defendant to secure that testimony, nor was the trial judge apprised of this situation during the trial. The comments of the prosecutor were first brought to the attention of the trial court in the post-trial hearings. The State contends that the lateness in bringing this to the attention of the trial court and the failure to subpoena the prospective witness do not warrant a reversal of defendant's conviction.

The Federal courts of appeals in three circuits have held that a due process violation caused by substantial governmental interference with a defense witness' free and unhampered choice to testify does not require a finding of prejudice to the defendant in order to reverse a conviction. (*United States v. Hammond* (5th Cir. 1979), 598 F.2d 1008; *United States v. Morrison* (3rd Cir. 1976), 535 F.2d 223; *United States v. Thomas* (6th Cir. 1973), 488 F.2d 334.) They hold that this type of due process violation is harmful *per se*. In *Webb v. Texas* (1972), 409 U.S. 95, 34 L. Ed. 2d, 330, 93 S. Ct. 351, which found a due process violation of this type was caused by the remarks of the trial judge, the majority opinion reversed the conviction without discussion of its prejudice under all the facts of that case. However, two justices dissented on the basis that the comments of the trial judge, though improper, should not mandate summary reversal without sufficient facts to demonstrate the depth of prejudice. (409 U.S. 95, 98-99, 34 L. Ed. 2d 330, 334, 93 S. Ct. 351, 354 (Blackmun and Rehnquist, JJ., dissenting).) Significantly, in all the Federal cases cited immediately above, the improper comments to the witness were brought to the attention of the trial court *during* the course of the trial. Likewise, in the three above-mentioned State cases (*People v. Shapiro* (1980), 50 N.Y.2d 747, 409 N.E.2d 897; *Campbell v. State* (1977), 37 Md. App. 89, 376 A.2d 866; *State v. Brown* (Mo. App. 1976), 543 S.W.2d 56), the trial judge was informed of the improper prosecutorial conduct toward the witness during the trial.

■■ In Illinois, we have found no direct precedent which is controlling. Generally, a defendant is entitled to a reversal only if he can show pre-

judice or that he was denied a fair trial. (*People v. Warmack* (1980), 83 Ill. 2d 112, 129, 413 N.E.2d 1254; *People v. Lipp* (1978), 63 Ill. App. 3d 1034, 1036, 380 N.E.2d 1007.) Issues not raised at trial or in a post-trial motion, both constitutional and nonconstitutional are waived. *People v. Lykins* (1979), 77 Ill. 2d 35, 38, 394 N.E.2d 1182, *cert. denied* (1980), 445 U.S. 952, 63 L. Ed. 2d 787, 100 S. Ct. 1602.

In *People v. Eubank* (1970), 46 Ill. 2d 383, 263 N.E.2d 869, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1657, wherein our supreme court dealt with the issue of allegations of intimidation of a prospective defense witness raised initially in defendant's motion for new trial, the court held that the trial court was not in error in denying defendant's motion for new trial based upon the disputed testimony of the witness and the prosecution witnesses on the nature of the alleged threats. Of further importance was the court's statement that "[t]he record establishes that Silvani [the prospective witness] was present at the court largely throughout the trial and was thus available as a witness for either the defense or the State." 46 Ill. 2d 383, 393, 263 N.E.2d 869, 875.

In the case at bar, the prospective witness was available to the defendant throughout the trial. The record further reveals that, at the time of the prosecutor's comments, defendant's counsel contemplated subpoening attorney Donat concerning those comments, yet this was only done for the post-trial motion. Additionally, whether the prospective witness was a crucial one for the defendant is in serious doubt from this record. He was not on defendant's list of witnesses, defendant's counsel chose not to call him as his assessment was that the State had a weak case, and there was no offer of proof by defendant as to what the witness would have stated. These factors coupled with the failure to bring the witness and the circumstances of the prosecutor's comments before the court during the trial, constitute a waiver of any due process argument which theoretically may have evolved from the improper comments of the prosecuting attorney.

■■ Had defendant brought the prospective witness before the court during the trial, the trial court could have dealt with the situation at that time which may have led to the witness testifying or a mistrial being declared. We do not believe that as a matter of trial strategy, the defendant can refuse to call the witness, fail to inform the court of the prosecutor's conduct, and await the outcome of the trial before raising this issue. Under the particular circumstances of this case, the defendant has waived any claim of error he may have for the improper comments of the prosecutor by the failure to call the witness at trial and to show any alleged prejudice.

Defendant's second argument on appeal is that because the court did not instruct the jury to make a finding as to the value of the post-hole

digger, nor specifically instruct the jury that a value in excess of $150 was an element of the offense in the issues instruction, his conviction should be reduced to a misdemeanor theft. The State counters that defendant has waived this issue by failing to object to the State's proposed issues instruction at the conference on jury instructions or to tender a proper instruction himself. The issues instruction tendered by the State and given by the court did not refer to the element of value. The guilty verdict form did include the finding "Guilty of Theft over $150.00."

The disposition of this issue is controlled by our supreme court's decision in *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 415 N.E.2d 1027, wherein it was held that a felony theft conviction need not be summarily reversed when the jury is not instructed to find whether the value of the property exceeds $150 and no objection was raised at the conference on jury instructions or any instruction offered by defendant on this element. In determining whether the failure to object to the State's instruction fell within a limited exception to the waiver rule contained in Supreme Court Rule 451(c) (Ill. Rev. Stat. 1979, ch. 110A, par. 451(c)) which permits the review of substantial defects in instructions if the interests of justice require, the court stated:

> "Although the jury ought to be instructed to find whether the value of the stolen property exceeds $150 wherever felony theft is charged, particularly where value is disputed, the evidence here is overwhelming and uncontradicted in each case that the value of the stolen property greatly exceeded $150. In these circumstances it seems inconceivable that defendants could have suffered any prejudice. *People v. Beller* (1979), 74 Ill. 2d 514, 525." 82 Ill. 2d 177, 182, 415 N.E.2d 1027, 1030.

■■ In the case at bar, no objection was made by defendant at the conference on jury instructions to the State's issues instruction which omitted the element of value, nor did defendant tender an instruction on value. Although he did raise this issue in his post-trial motion for a new trial, the failure to object at the conference on jury instructions is sufficient to waive the issue on appeal. (See *People v. Underwood* (1978), 72 Ill. 2d 124, 129-30, 378 N.E.2d 513.) The reason for the rule was stated in *Underwood*, quoting from *Onderisin v. Elgin, Joliet & Eastern Ry. Co.* (1959), 20 Ill. App. 2d 73, 77-78, 155 N.E.2d 338, as follows:

> " 'The purpose of the conference is to afford counsel an opportunity to object to or correct erroneous instructions. As officers of the court, counsel have a duty to cooperate with the trial judge to the end that the jury may be properly instructed. Enlightened trial practice does not permit counsel under the guise of trial strategy to sit idly by and permit instructions to be given the jury without specific objection and then be given the advantage of predicating

error thereon by using the error for the first time in a post-trial motion.' " (72 Ill. 2d 124, 129-30.)

Also, even though defendant did object to the foundation laid for the testimony that the post-hole digger was worth $500, the objection was overruled, defendant has not appealed that ruling, and the testimony of value was undisputed at trial. The jury also specifically returned a guilty verdict of theft over $150. Under these circumstances, we find that the defendant waived the asserted error in the jury instruction by his failure to object and that the case also does not qualify for the Rule 451(c) exception to the waiver rule. We further find, as the court did in *Tannenbaum*, that the facts here involved are dissimilar to those present in *People v. Dell* (1972), 52 Ill. 2d 393, 288 N.E.2d 459, cited by the defendant.

■■ Finally, as the State has conceded that the sentence to a probationary term of 36 months for a Class 3 felony exceeded the statutory limits (Ill. Rev. Stat. 1979, ch. 38, par. 1005—6—2(b)(2)), we reduce the term of probation to 30 months as requested by the defendant.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed as modified by the reduction of the probation term to 30 months.

Affirmed as modified.

LINDBERG and NASH, JJ., concur.