Chester Jordan JOHNSTON, Jr.,
Petitioner-Appellant,

v.

Edwin Lloyd PITTMAN, Attorney General, State of Mississippi, and Morris L. Thigpen, Superintendent, Mississippi Department of Corrections, Respondents-Appellees.

No. 83–4391
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

May 14, 1984.

Jim Waide, West Point, Miss., Jacqueline C. Estes, Tupelo, Miss., for petitioner-appellant.

William S. Boyd, III, Jackson, Miss., for respondents-appellees.

Before RUBIN, JOLLY and DAVIS, Circuit Judges.

PER CURIAM:

The petitioner, Chester Jordan Johnston, Jr., seeks habeas corpus relief from his conviction and forty-five-year prison sentence for committing a rape in 1978 in Jackson, Mississippi. He alleges that the state denied his due process rights when the police department did not make certain evidence available to him before it spoiled, and when the trial court refused to allow him to cross-examine the investigating police officer regarding a past relationship with the victim. The United States District Court for the Southern District of Mississippi denied habeas relief. We affirm.

## I.

The facts in this case appear in detail in the opinion rendered on direct appeal by the Mississippi Supreme Court. *Johnston v. State*, 376 So.2d 1343, 1344–45 (Miss. 1979). We recount them here only briefly. On the night of March 19, 1978, Cynthia Bethany was alone in her apartment when her neighbor, Chester Johnston, knocked on her door and asked to use her telephone to call a friend to help him repair a flat tire. Bethany replied that she would not come out into the hall, but if Johnston would return to his apartment, she would place the telephone book in the hall so he could locate his friend's number. She then would place the call for him. When she opened the door to place the telephone book on the floor, Johnston forced his way into her apartment and raped her.

After Johnston left, Bethany immediately called the police, and then called her minister who, along with his wife, accompanied her to the University Hospital for an examination. The examining physician observed swelling and bruises on Bethany's head, face, neck and mouth. A wet prep smear of her vaginal cavity revealed motile sperm, indicating recent intercourse. The fluid samples from the swabs and prep smear were sealed in plastic tubes and delivered to the police as a "rape pack."

Officer Dennis Freshour and his partner transported the rape pack to the precinct station to be picked up by the property division of the Jackson Police Department and then transferred to the crime laboratory. The next day Officer Freshour arrested Johnston.

Following normal procedures, the only test the police conducted on the contents of the rape pack was for presence of sperm. On April 14, 1978, almost a month after the incident, Johnston made a general request for exculpatory matter, and a specific request for the results of blood tests and blood type comparisons made with any "semen, skin scrapings or other matter taken from the body of the Prosecutrix." The state, having no exculpatory matter, and having made no blood tests or other comparisons, did not produce any evidence in response to this request.

On June 29, 1978, more than three months after the incident, Johnston requested that the contents of the rape pack be made available to him so that he could compare the results of tests on blood substance secretions that might be in the rape pack with his own blood type.[1] If the blood type revealed by the secretions in the rape pack were different from his own, Johnston argues that he would have had positive proof that he did not commit the rape. To be reliable, however, a blood type test on a rape pack should be made between one week and one month after the wet prep smear. Thus, by the end of June the fluid samples in the rape pack were no longer useful for blood-type testing.

At trial Johnston and an alibi witness testified that Johnston was with his ex-wife in Pearl, Mississippi, on the night of the rape. The prosecution's evidence consisted of the results of the hospital examination conducted on the night of the rape, the results of the sperm test, the testimony of several neighbors who heard a struggle going on in Bethany's apartment, the positive results of a microscopic comparative examination of Johnston's hair with hair found at the scene of the rape, and Bethany's own testimony and positive identification of her neighbor, Johnston, as the rapist. A jury returned a verdict of guilty.

Johnston appealed his conviction to the Mississippi Supreme Court, asserting the claims he asserts in this habeas action. The Mississippi Supreme Court affirmed his conviction.

## II.

Johnston first claims that the state denied his due process rights by failing either to conduct blood-type tests on

---

1. More than 80% of all humans secrete blood group substances in all their secretions. The secretions contain substances which make possible the determination of the blood type of the secreter.

the contents of the rape pack, or to produce the pack in response to his first request, so that he could have the tests conducted himself. According to *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the Constitution requires the prosecution to reveal material evidence favorable to the defendant upon the defendant's request. *Brady,* however, does not extend due process to the point of requiring the state to pursue every possible avenue of investigation and make the defendant's case for him. *Cf. Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706, 713 (1972) ("no constitutional requirement that the prosecution make a complete and detailed accounting"). Thus, that the police department's normal procedure does not include blood-type testing, does not violate due process or implicate *Brady.* Additionally, the rape package, untested for blood type, was not evidence favorable to the defendant so that the state should have produced it in response to Johnston's general request. Indeed, to the extent that the pack had probative value at all, it was unfavorable to Johnston because of the sperm test conducted on it.

■ Johnston further claims that the police department violated his due process rights by allowing the contents of the rape pack to spoil before finally giving it to him in response to his specific request of June 29. The state concedes that it has an obligation to make a good faith effort to preserve important material and locate it once the defendant requests production. *See Armstrong v. Collier,* 536 F.2d 72, 78 (5th Cir.1976), *citing United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642 (D.C. Cir.1971). The state, however, claims to be in the same position as if it had accidentally lost or destroyed the evidence, and argues that in this case its obligation is excused because it acted in good faith.

■ Finding no cases directly on point, in which the requested evidence is no longer useful for the purpose for which the defendant wants it, we agree that cases determining when the state may be excused from its obligation because it lost or destroyed the requested evidence provide an appropriate analysis for this case. In *Armstrong v. Collier,* a case in which the state misplaced the requested evidence, this court enumerated three factors to consider in determining whether to excuse the state: the state's bad faith or negligence, the importance of the evidence, and the other evidence of guilt adduced at trial. 536 F.2d at 78. In this case the three factors favor the state.

First, the record contains no evidence either of bad faith or of negligence. The Jackson Police Department followed its routine procedures in handling the rape pack. It did not attempt to suppress the evidence, and delivered it promptly to Johnston once he made a specific request for it.

Second, the results of blood-type tests would not have been important enough in this case to require granting habeas relief to cure their non-availability. According to Johnston, the test results were crucial because if they had shown that the blood type of the person who had intercourse with Bethany was not the same as his own blood type, he would have had irrefutable evidence of his innocence. The operative word in Johnston's argument, however, is "if." Johnston's own witness, Director of Laboratories at the University Hospital, testified that blood-type tests performed on semen samples are reliable only if performed within a month after taking the sample, and then are only about eighty per cent reliable. When the sample is mixed with vaginal fluid, the reliability drops to fifty per cent. Thus, even if the state had produced the sample in response to Johnston's general request in April, which, we emphasize, it had no obligation to do, any blood-type test performed on it, even if favorable to Johnston, would not have been proof of innocence.

Third, even if Johnston had introduced blood-type test results tending to prove his innocence, the state adduced enough evidence for a jury nonetheless to conclude beyond a reasonable doubt that Johnston committed the rape. Johnston argues that

the state's evidence does not point overwhelmingly toward guilt and that this case is a close one. The blood-type test results, he argues, might have tipped the weight of the evidence toward innocence. Our own review of the evidence, however, suggests otherwise. Although the state's only direct evidence was the victim's own testimony, the other, circumstantial evidence adduced, such as the medical evidence, the microscopic hair comparison, and the testimony of neighbors who heard screams emanating from the victim's apartment, indicates that the case was not so close that the availability of favorable blood-test results necessarily would have changed the jury's verdict.

In addition to arguing that the *Armstrong* factors favor granting habeas relief, Johnston relies on the cases of *Davis v. Pitchess*, 388 F.Supp. 105 (C.D.Cal.1974), *aff'd* 518 F.2d 141 (9th Cir.), *reversed on other grounds*, 421 U.S. 482, 95 S.Ct. 1748, 44 L.Ed.2d 317 (1975), and *Bowen v. Eyman*, 324 F.Supp. 339 (D.Ariz.1970). These cases, however, are distinguishable from Johnston's case. In *Bowen*, the district court granted habeas relief because the state failed to appoint an expert to conduct blood-group-typing tests on semen samples taken from the victim. Unlike Johnston, however, Bowen, an indigent, made a specific request that the state conduct the tests. In *Davis*, the state first suppressed the victim's clothing and slides of her vaginal fluid, contrary to its obligation to produce them upon request. After trial, the state, evidently in good faith, destroyed the clothing and slides. The court first granted habeas relief because of the unconstitutional suppression of requested evidence. 388 F.2d at 106. Upon Davis's motion to make unconditional the formerly issued writ which gave the state a right to try Davis again, the district court held that after suppressing the evidence unconstitutionally, the state could not invoke a good faith defense to excuse its failure to produce the requested evidence. *Id.* at 109.

### III.

Johnston also alleges that the state denied his due process rights by not allowing him to cross-examine Bethany in front of the jury regarding her past relationship with Freshour, the investigating officer. At a hearing held pursuant to the state's Motion in Limine and the defendant's notice filed pursuant to section 97–3–68 of the Mississippi Code, Johnston questioned Bethany thoroughly about her relationship with Freshour, as well as about other previous relationships. She testified unequivocally that she had not had sexual intercourse with anyone during the month before the rape. The trial judge granted the state's motion on the basis that evidence of Bethany's sexual conduct a month previously was remote and therefore "incompetent, irrelevant and immaterial." *Johnston*, 376 So.2d at 1346–47.

Our inquiry into Johnston's claim is a limited one. A federal court generally will not review collaterally a trial court's decision on the admissibility of evidence unless that decision deprived the defendant of a fundamentally fair trial. *Nettles v. Wainwright*, 677 F.2d 410, 414 (5th Cir. 1982). *Accord Taylor v. Curry*, 708 F.2d 886 (2d Cir.1983) (citing cases). We review Johnston's claim, therefore, keeping in mind the deference due the trial court.

Johnston sought to use the evidence of Bethany's relationship with Freshour to impeach her testimony.[2] Johnston argues that Bethany was under "police pressure" because of her previous relationship with Freshour. Relying on *Davis v. Alaska*, 415 U.S. 308, 311, 94 S.Ct. 1105, 1107, 39 L.Ed.2d 347 (1974), he argues that her previous personal relationship with the investigating officer suggests a possible motive for perjury and that he had a constitutional right to expose that motive to the jury. We do not agree.

In *Davis* the witness was on probation while at the same time assisting the police by identifying the defendant at trial. The

---

**2.** Because Johnston did not seek to use the evidence to prove consent, the rape shield statute, Miss.Code Ann. § 97–3–70 (1972 & Supp.1983), is inapplicable.

witness also testified that he had never been questioned by law enforcement officers. *Id.* at 311–13, 94 S.Ct. at 1108–09. The defendant wanted to elicit testimony of probationary status in order to show that the witness had prior experience with the police, and also to show that the witness may have been under pressure from the police to cooperate at trial. The trial court refused to allow cross-examination regarding prior criminal activity because the witness was a juvenile, and the state had a law explicitly excluding juvenile records from evidence in regular court proceedings. *Id.* at 317–19, 94 S.Ct. at 1111. The Court held that under the facts presented, the defendant's right to cross-examine the witness, whose testimony obviously was suspect, outweighed the state's interest in protecting juveniles. *Id.* at 318, 94 S.Ct. 1112.

█ *Davis* does not control this case for two reasons: first, because the record contains no evidence that Bethany's testimony, either at the pre-trial hearing or at trial, was suspect, and second, because any pressure Bethany possibly could have felt owing to a previous personal relationship with one policeman that ended a month earlier does not supply the clear motive for biased testimony that was the Court's concern in *Davis.*

Further, and not insignificantly, at some point, the prejudicial effect of any evidence outweighs its relevance. This case certainly is one in which the likely prejudicial effect of exposing the previous relationship outweighed whatever relevance that evidence might have had to Bethany's veracity. In essence, Johnston's complaint is that he did not have an opportunity to divert the jury's attention away from the crime alleged and toward Bethany's chastity, or toward some totally unfounded theory of what might have happened on the night of March 19. The court's refusal to allow him to capitalize on the coincidence that Bethany and Freshour once had an intimate personal relationship facilitated, *rather than* denied fundamental fairness at trial.

The order of the district court denying Johnston's habeas corpus petition is

AFFIRMED.